Daniel Srourian (SBN 285678)
**SROURIAN LAW FIRM, P.C.**
468 N. Camden Dr.
Suite 200
Beverly Hills, CA 90210
P: (213) 474-3800
E: daniel@slfla.com

Sonjay C. Singh*
**SIRI & GLIMSTAD LLP**
400 East Pratt Street
8th Floor - #16946751
Baltimore, MD 21202
E: ssingh@sirillp.com

M. Zane Johnson*
**SIRI & GLIMSTAD LLP**
100 Pearl Street
14th Floor - # 16946876
Hartford, CT 06103
E: zjohnson@sirillp.com

**pro hac vice admission anticipated*

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION**

**S.E.**, individually and on behalf of all others similarly situated,

Plaintiff,

v.

**ADVANCED DERMATOLOGY & SKIN CANCER SPECIALISTS, INC., A PROFESSIONAL CORPORATION**

Defendant.

No. 5:26-cv-02845

**CLASS ACTION COMPLAINT**

Plaintiff S.E. ("Plaintiff"), individually and on behalf of all similarly situated persons, alleges the following against Defendant Advanced Dermatology & Skin Cancer Specialists, Inc., A Professional Corporation ("ADSCS" or "Defendant"), based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation by her counsel and review of public documents as to all other matters:

## I. INTRODUCTION

1. Information concerning an individual's health is among the most sensitive, and closely guarded information in our society.

2. The unwanted disclosure of such information can be enormously harmful. It can result in discrimination in the workplace, and denial of insurance coverage. And, if people are unable to trust that their sensitive health information will be kept confidential, they are much less likely to seek medical care when they need it most.

3. Defendant ADSCS is a dermatology practice with ten locations in Southern California and four in Northern California, including its location in Victorville, CA where Plaintiff sought treatment. It boasts that its physicians and providers have over 40 years of combined experience treating all dermatology and skin care issues, and prides itself on providing the highest level of dermatology care.[1]

4. Through the ADSCS website - https://advanceddermspecialists.com/ (the "Website") – patients can research medical and dermatological treatments, book appointments, make inquiries, and download patient forms.

---

[1] *California's Leading Skin Care Clinic*, ADVANCED DERMATOLOGISTS & SKIN CANCER SPECIALISTS, https://advanceddermspecialists.com/ (last visited Apr. 24, 2026).

5. As Defendant acknowledges, "[t]rust in medical care does not appear overnight. … It develops through alignment with values, careful use, and respect for patient experience."[2] Indeed, "[t]rust shapes future choices."[3]

6. Unfortunately, unbeknownst to Plaintiff and other visitors to Defendant's website, their private personal and health information was not actually being kept private. Instead, through Defendant's patient scheduling software, Defendant collected and transmitted personally identifiable, sensitive health information pertaining to Plaintiff's and other patients' upcoming appointments, including the fact that they had made medical appointment(s); likely reason(s) for their appointment(s); and the location(s) of their appointment(s) (collectively, "Sensitive Health Information") to unauthorized third parties, including Alphabet, Inc. ("Google"), through the use of surreptitious online tracking tools.

7. Online advertising giants, like Google, compile as much information as possible about American consumers, including information relating to the most private aspects of their lives. This information is then used as fuel for a massive, targeted advertising enterprise.

8. Thus, any information about a person captured by these online behemoths can be used to stream ads to that person, among other uses. If Google receives information that a person is concerned about a potential health-related issue (e.g., dermatological care), it will collect that information and allow its clients to use that information to stream ads related to health care products and

---

[2] *Why SRT Therapy for Skin Cancer is Clinically Trusted*, ADVANCED DERMATOLOGISTS & SKIN CANCER SPECIALISTS, https://advanceddermspecialists.com/srt-therapy-skin-cancer-clinical-trust/ (last visited Apr. 24, 2026).

[3] *Id.*

services (e.g., for dermatological care, skin care products, and more) to that person's computers and smartphones.

9. Google offers its clients' website operators access to its proprietary suites of marketing, advertising, and customer analytics software, including Google Analytics, Google AdSense and Google Tag Manager (collectively, the "Business Tools"). Armed with these Business Tools, website operators can leverage Google's enormous database of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

10. But, in exchange for access to these Business Tools, website operators install Google's surveillance software on their website (the "Tracking Tools"), including 'tracking pixels' ("Pixels") and third-party 'cookies' that capture sensitive, personally identifiable information provided to the website operator by its website users. This sensitive information can include a unique identifier that Google uses to identify that user, regardless of what computer or phone is used to access the website. The Tracking Tools can also capture and share other information like the specific webpages visited by a website user, items added to an online shopping cart by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer.

11. In essence, when website operators use Google's Business Tools, they choose to participate in Google's mass surveillance network and, in turn, benefit from Google's collection of user data at the expense of their website user's privacy.

12. Defendant is one of the companies that has chosen to prioritize its marketing efforts and profits over its patients' privacy by installing Google's Tracking Tools on the Website.

13. Plaintiff and the Class Members used Defendant's website and had their personal Sensitive Health Information tracked by Defendant using the Tracking Tools. However, Defendant ***never*** obtained authorization from Plaintiff or Class Members to share their Sensitive Health Information with third parties. At all times relevant to this action, Plaintiff and Class Members gave no informed consent for information about their Sensitive Health Information to be transmitted to the third parties, including the largest advertiser and compiler of user information.

14. Health information is regulated by both state and federal law, including the Health Insurance Portability and Accountability Act ("HIPAA"), which imposes criminal penalties on disclosing individually identifiable health information to a third party, including information that "is created or received by a health care provider" and "relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual[.]"[4]

15. Accordingly, Defendant's disclosure of Plaintiff's and Class Members' Sensitive Health Information constitutes a violation of HIPAA.

16. As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of medical privacy; (ii) lack of trust in communicating with medical providers; (iii) emotional distress and heightened concerns related to the release of Sensitive Health Information to third parties, (iv) loss of benefit of the bargain; (v) diminution of value of the Sensitive Health Information; (vi) statutory damages and (vii) continued and ongoing risk to their Sensitive Health Information.

---

[4] 18 U.S.C. § 1320d-(6).

17. Therefore, Plaintiff seeks, on behalf of herself and a class of similarly situated persons, to remedy these harms and asserts the following statutory and common law claims against Defendant: Invasion of Privacy; Breach of Confidence; Breach of Fiduciary Duty; Negligence; Breach of Implied Contract; Unjust Enrichment; violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2511, *et seq.*; violations of the California Invasion of Privacy Act, Cal. Penal Code §§ 631, 638.50 & 638.51; Invasion of Privacy under the California Constitution; violations of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; and violations of the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502.

## II. PARTIES

***Plaintiff S.E.***

18. Plaintiff S.E. is a citizen of the State of California, residing in San Bernardino County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

19. Plaintiff accessed the Website on her personal electronic device to schedule and/or reschedule appointments with SDSCS's location in Victorville, CA in the same manner as depicted in §IV(d), *infra*.

20. Plaintiff scheduled appointments with Defendant to treat skin cancer, including weekly appointments between May 1, 2023, and June 26, 2023. Plaintiff also scheduled a recheck appointment in July 2024, a spot check appointment in November, 2024, a biopsy in December, 2024, and a check-up in June, 2025. Plaintiff scheduled some, but not all of these appointments using Defendant's Website.

21. Unbeknownst to Plaintiff, the Website transmitted the Sensitive Health Information that she provided to ADSCS, including that she submitted a request to book an appointment with ADSCS's Victorville, CA location.

22. Plaintiff S.E. never authorized Defendant to disclose any aspect of her communications with the Website to third parties, including the Sensitive Health Information that she provided through the Website.

23. On every occasion that she visited the Website, Plaintiff possessed an account with Google, and she accessed the Website while logged into her Google account on the same device. Plaintiff also provided her Google email address to Defendant through the Website, and received emails related to her appointments to her Google email account.

24. After providing her Sensitive Health Information to Defendant through the Website, Plaintiff S.E. began seeing targeted online advertisements for services and products related to skin cancer.

***Defendant Advanced Dermatology & Skin Cancer Specialists, Inc., A Professional Corporation***

25. Defendant Advanced Dermatology & Skin Cancer Specialists, Inc., A Professional Corporation is a for-profit corporation incorporated in the State of California with its principal place of business at 31720 South Temecula Parkway, Suite 200, Temecula, CA 92592.

## III. JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members. This Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint asserts a claim for violation of federal law, specifically, the ECPA, 18 U.S.C. § 2511. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

27. This Court has general personal jurisdiction over Defendant because Defendant is headquartered in this district and maintains its principal place of business in the State of California and, specifically, within this District. In addition, a substantial portion of Defendant's business is conducted in this district, as ten of its fourteen locations are in this district.

28. Venue is proper in this District under 28 U.S.C. § 1391(a)-(d) because: Plaintiff resides in this district; Defendant's principal place of business is located in this District; Defendant collect and redistribute Plaintiff's and Class Members' Sensitive Health Information in this District; and Defendant caused harm to Plaintiff and Class Members residing in this District.

# IV. FACTUAL ALLEGATIONS

## A. THE ADVANCED DERMATOLOGY WEBSITE

29. ADSCS was established in 2012 "by experienced dermatologists and PAs who saw a need for quality medical and cosmetic dermatology procedures."[5]

30. ADSCS owns and operates the Website, available at advanceddermspecialists.com.

31. Unbeknownst to prospective, current, and past patients, ADSCS secretly embedded tracking technologies on the Website, allowing the interception of the private PII and sensitive health records of prospective patients visiting the Website.

### i. Defendant's Website Uses HTTPS

32. Most websites, including Defendant's website, use HyperText Transfer Protocol Secure (HTTPS), a protocol for transmitting information over the internet securely.

33. When using HTTPS, nearly all communication between a website user and the website is encrypted. The only information transmitted unencrypted is the identity of the web "host." For example, if searching Google for https, one may visit the following URL: https://www.google.com/search?q=https. The "host" in this URL is www.google.com. This information must be transmitted unencrypted, because it is routing information required to identify the destination for the request. The remainder of the information transmitted, including the "search?q=https" portion of the URL, is transmitted encrypted.

34. Because nearly all information between a browser and a website is encrypted, an observer of those communications (such as an individual's internet service

---

[5] *Advanced Dermatology & Skin Cancer Specialists Palm Spring*, YELP, https://www.yelp.com/biz/advanced-dermatology-and-skin-cancer-specialists-palm-springs-6 (last visited Apr. 24, 2026). The Website contains a link to this Yelp page.

provider) could learn that the user of the browser is communicating with a specific website, and certain record information, such as how often those communications occur, but an observer could not learn about the substance of the communications, including which web pages the user visited.

35. Due to encryption, even a technically sophisticated user of the internet can reasonably expect a significant degree of privacy in any of their communications sent over HTTPS: users can reasonably expect that the contents of their communications, including the web pages they visit and any inquiries they make on those web pages, will only be available to the user themselves and the website operator.

36. Encryption of URLs is important due to commonly followed practices in website design. It is considered a "best practice" by many website developers to make URLs, or "Universal Resource Locators" organized and relatively human-readable. The URL path, therefore, often contains important information about the contents of the information transmitted using the URL.[6]

37. The URLs of Defendant's Website are descriptive. The URLs of its web pages for its Victorville, CA location "advanceddermspecialists.com/victorville" and for skin cancer "advanceddermspecialists.com/skin-cancer/" contain information related to the contents of those pages. If a third party learned that a user visited both those pages, and that the user then made an appointment with Defendant, the third party could reasonably infer that the user sought treatment for skin cancer at Defendant's location in Victorville, CA.

[6] Neil Patel, *The Complete Guide on Structuring Your URLs Correctly*, NEILPATEL, https://neilpatel.com/blog/complete-guide-structuring-urls/ (last visited March 27, 2026).

**B. BACKGROUND ON TRACKING TECHNOLOGY**

38. Pixels are one of the more common forms of tracking technology used by website operators to track users' behavior, interactions, and the content of their communications online.

39. Pixels are typically snippets of code embedded on a website that surreptitiously intercept a user's actions, including private communications on that app or property.

40. Pixels can collect a shocking amount of private information regarding an individual's online communications, including their searches, queries, what content they select and view, what they enter into online forms, and their habits and behaviors.

41. Web developers, like Defendant, can use pixels to send additional information specific to their website. As described herein, Defendant configured the pixels at issue in this case to transmit and intercept patients' private records, including information showing they booked appointments at specific ADSCS clinics.

42. As the Federal Trade Commission ("FTC") explains, one of the purposes of using pixels is to monetize consumers' data: "Pixel tracking can be monetized in several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns . . . Another is that companies can monetize the data collected[.]"[7]

43. Particularly problematic, consumers have no way of knowing these pixels are present because they are invisible. The FTC further warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information.

---

[7] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last visited Mar. 3, 2026).

> Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with . . . Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[8]

44. As described in the sections below, Defendant used Tracking Technologies provided by at least Google and Microsoft. Plaintiff and Class Members had no way of knowing Defendant used these Tracking Technologies or that their private data would be used and intercepted as a result.

45. Especially problematic, Google and Microsoft are two of the largest advertising platforms in the world. Google uses the intercepted information for its own commercial purposes, including to augment the profiles it maintains about individuals, and to improve its technology for targeting individuals with ads on properties it owns and operates (e.g., Google.com and YouTube) and other web properties that participate in its ad networks. Microsoft similarly uses intercepted information for targeted information on its platforms and ad networks.

## C. GOOGLE'S TRACKING TECHNOLOGY

46. Google is one of the largest digital advertising platforms in the country, with a market capitalization of over $3 trillion dollars. Google accounts for 26.8% of the total digital advertising revenue generated in the United States.[9]

---

[8] *Id.*

[9] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and %2012.5%20percent%2C%20respectively https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed Oct. 23, 2025).

In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[10]

47. Google "make[s] money" from its "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising." [11]

48. Google offers various tracking technologies, including Google Analytics and Google Ads, which exist solely to help drive ad revenue. For instance, Google's analytics products integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue. Products like Google Analytics, Google Chrome, and Google's Android operating system also improve the company's advertising network and capabilities by providing direct pipeline to Google of data that it uses to enrich the vast amount of interconnected data it maintains about them.

49. Google advertises Google Analytics and other business tools to website operators to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[12]

---

[10] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last accessed Oct. 23, 2025).

[11] ALPHABET INC. SEC FORM 10-K FOR FISCAL YEAR ENDED DECEMBER 31, 2020, https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

[12] *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last accessed Oct. 23, 2025).

50. Google Analytics is deployed by dropping a piece of Google-engineered code on a given web property or app. This code contemporaneously intercepts a user's interaction with the web property or app every time the user visits or uses it, including what pages they visit, what they click on, and input into text fields.

51. The code also collects multiple pieces of identifiable information so that Google can connect that data within its systems to a specific individual. This includes multiple cookie values Google creates for this precise purpose, along with device information, such as unique ad identifiers and settings used to create a digital "fingerprint" for people, IP addresses that tie them to specific locations (like their home), and more. This does not require a person to have a Google account, to be signed into their Google account, or using a Google product. Google has a special set of cookies and systems created specifically to track and identity individuals not signed into a Google product at the time they use a website, or who attempt to use private browsing mode.10F[13]

52. Google provides web property owners with analytics about their sites and apps based on this data, including reports on acquisition (e.g., information about where the customer's traffic originates, the methods by which users arrive at the customer's site or app, and the marketing efforts the customer uses to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits), and demographics (e.g., classify the customer's users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities). However, the main purpose of Google's tracking technologies, including Google Analytics, is to promote targeted ads both on Google.com (so called "search ads" or "Google ads") or other Google owned and

---

[13] *Brown v. Google LLC*, 685 F. Supp. 3d 909, 925 n.11 (N.D. Cal. 2023).

operated products (e.g., YouTube), and across Google's display network (Google "display ads") which include thousands if not millions of web properties.

53. In addition to providing customers with analytics ads services, Google also uses the data collected through Google Analytics and other tracking technologies for its own purposes, including to improve its ad targeting capabilities, machine learning and AI models, products and services, and data collections on users. Thus, the data Defendant disclosed, and allowed Google to intercept, is actively used by Google to improve and serve advertisements. And individual consumers who have their data disclosed by one entity (for instance, Defendant) will see ads for other entities based on their data as a result of Google's advertising system.

54. Further, customers like Defendant can also send data to Google through a server-to-server connection or through a third-party intermediary. This allows customers like Defendant to disguise what data it sends to Google because no one (other than these parties) can observe what data is sent on the server-side.

## D. THE DATA DEFENDANT DISCLOSED INDIVIDUALLY IDENTIFIED EACH CLASS MEMBER, INCLUDING PLAINTIFF

55. Google provides customers like Defendant with one or more unique cookies and identifiers precisely so each individual whose data is sent through the Tracking Technologies can be identified and targeted. Google has its own collection of cookies and identifiers, including the "ide" DoubleClick cookie, the "tid" identifier, "cid" identifier, and "sid" identifier. These cookies and identifiers all serve the same purpose—to uniquely track and identify consumers.

56. In this way, these unique identifiers serve a similar function to social security numbers used by the United States Government—they are associated with only one person, much like the Government knows which specific person is associated with each social security number. Through these identifiers, the

Tracking Tool Providers know which specific person is associated with each of their unique identifiers.

57. But this is not all Defendant disclosed. The Tracking Tool Providers also obtained Plaintiff's and Class Members' IP addresses, which are also used to identify individual consumers. For instance, Google uses consumers' IP addresses, either alone or in combination with other information, to match and identify each individual whose data it receives through its Tracking Technology.

58. Google is especially able to identify individuals who have accounts with them. A remarkable number of Americans possess a Google account. One-third of Americans have accounts with Google's Gmail e-mail client and over 80-percent of Americans use YouTube, Google's video client.[14] When these users visit a website, like the Website, that utilizes these companies' Tracking Technologies, any information collected by the Pixels can be linked to the user's respective accounts with these entities through identifiers and other means.

### E. DEFENDANT DISCLOSED PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE HEALTH INFORMATION TO GOOGLE.

59. To schedule an appointment with Defendant's clinicians, Plaintiff and Class Members could complete a scheduling form on the Website.

60. Unbeknownst to Plaintiff and Class Members, Defendant intentionally configured the Tracking Tools installed on the Website to capture and

---

[14] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ ((last accessed Oct. 23, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last accessed Oct. 23, 2025); Jeffrey Gottfried and Eugene Park, *Americans' Social Media Use 2025*, PEW RESEARCH (Nov. 20, 2025), https://www.pewresearch.org/internet/2025/11/20/americans-social-media-use-2025/ (last visited Mar. 4, 2026).

transmit the Sensitive Health Information communicated through the Website to third parties, including Google.

61. The following screenshots ("Figures 1-3") depict network transmissions made by the Google Tracking Tools installed on the Website. The information provided in Figures 1-3 is exemplary information collected on the Website, and is not Plaintiff's information, but the Tracking Tools installed on the Website collected from the Plaintiff information that in sum and substance was similar to what is shown in the Figures. As Figures 1-3 show, when patients schedule an appointment using the Website, the Tracking Tools on the Website contemporaneously transmit to Google the fact that the patient initiated a request to schedule an appointment, the fact the user completed that request and has completed scheduling an appointment with a medical provider, the location of the patient's appointment, and, if the user reviewed the pages on the Website related to their health condition, the likely reason for the patient's appointment.

| | |
|---|---|
| dl | https://advanceddermspecialists.com/request-an-appointment/ola/services/dermatologist-in-temecula-ca |
| dr | https://advanceddermspecialists.com/request-an-appointment |
| sid | 1761598977 |
| sct | 1 |
| seg | 1 |
| dt | Request an Appointment - Advanced Dermatology Specialists |
| en | page_view |

***Figure 1**. Screenshot depicting a portion of the network traffic sent to Google from the Website when a Website user initiates a request to schedule an appointment at Defendant's Temecula, CA location. Included in the transmission, but not shown, are Google's tid, cid, and sid identifiers.*

| | |
|---|---|
| dl | https://advanceddermspecialists.com/request-an-appointment |
| dr | https://advanceddermspecialists.com/request-an-appointment/ola/services/dermatologist-in-temecula-ca |
| dt | Request an Appointment - Advanced Dermatology Specialists |
| en | cart_view.confirm_booking_cta.impression |

***Figure 2**. Screenshot depicting a portion of the network traffic sent to Google from the Website when a user completes a request to schedule an appointment at Defendant's Temecula, CA location. Included in the transmission, but not shown, are Google's tid, cid, and sid identifiers.*

```
dl: https://advanceddermspecialists.com/request-an-appointment/ola/services/dermatologist-in-temecula-ca
dr: https://advanceddermspecialists.com/alopecia-treatment
dt: Request an Appointment - Advanced Dermatology Specialists
```

***Figure 3**. Screenshot depicting a portion of the network traffic sent to Google from the Website when a user reviews information on "alopecia treatment" at Defendant's Temecula, CA location. Included in the transmission, but not shown, are Google's tid, cid, and sid identifiers.*

62. Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Plaintiff to her identity. As noted, the transmissions included Google's 'tid,' 'cid,' and 'sid' identifiers, which uniquely identify the user's Google account, along with other information that is commonly used to create a browser fingerprint, such as the user's language selection, screen resolution, IP address, web browser software and version number, and operating system and version number.

63. In their default state, Google's Pixels record and transmit only "automatic events," consisting largely of routine user behavior, such as clicking a link, clicking on an advertisement, or viewing a webpage.[15] The Google Pixels on the Website were purposefully configured to collect and transmit additional user data, including the information entered by patients on their appointment scheduling forms.

64. Moreover, because the Google 'tid' 'cid' and 'sid' cookies are sufficient to identify the subject of the Sensitive Health Information collected through the Tracking Tools, either scheduling or re-scheduling an appointment independently constitute a disclosure of the user's Sensitive Health

---

[15] *Automatically Collected Events*, GOOGLE ANALYTICS HELP, https://support.google.com/analytics/answer/9234069, (last visited on Mar. 7, 2026).

Information since these identifier cookies are transmitted contemporaneously with the data collected and transmitted by the Tracking Tools in both use cases.

65. The Tracking Tools do not just track when users book appointments. Instead, they track nearly all interaction users have with the Website, including each web page the user has viewed.

66. For example, if the user 1) views Defendant's web page for its Victorville, CA location; 2) view's Defendant's web page for skin cancer; and then 3) proceeds to book an appointment, as Plaintiff did, Google will receive information showing that the user has visited the Victorville, CA location page ad that the user has visited the page for skin cancer before receiving the information discussed above and shown in Figures 1-3.

67. Google is perhaps the world's most advanced aggregator and analyzer of information. Its trade is to connect the dots, making complicated inferences using data, even when there is no obvious connection between those dots. But it does not take a heroic deduction, or Google's advanced aggregation and analysis abilities, to learn that a user who has taken these actions, within this context, made an appointment to treat skin cancer at Defendant's Victorville, CA location.

68. Google's analytical power could be important if, for example, it did not have individually-identifying information about who took these actions. Then, as discussed above, Google might be able to use its digital fingerprinting technology to identify the user.

69. But, because each of these transmissions are accompanied by Google's "tid," "cid," and "sid" identifiers, which are, in most cases, already individually-identifying, Google does not need to rely on its digital fingerprinting technology. Accordingly, Google does not merely learn that an anonymous user

is considering addiction treatment, it learns that a specific, individually identified user is considering addiction treatment.

70. By installing third-party Tracking Tools, including tracking Pixels, on the Website, further configuring those Pixels to collect their patients' Sensitive Health Information, and/or by directing its patients to communicate through the Website despite having actual or constructive knowledge of the disclosures caused by the Tracking Tools, Defendant knowingly and intentionally caused Plaintiff's and Class Members' Sensitive Health Information to be transmitted to third parties, including Google.

### F. PLAINTIFF AND CLASS MEMBERS DID NOT PROVIDE CONSENT FOR DEFENDANT TO SHARE THEIR SENSITIVE HEALTH INFORMATION TO THIRD PARTIES

#### i. Defendant failed to inform Plaintiff and Class Members of its disclosure of Plaintiff's and Class Members' Sensitive Health Information.

71. Defendant breached Plaintiff's and Class Members' right to privacy by unlawfully disclosing their Sensitive Health Information to third parties, including Google.

72. Specifically, Plaintiff and Class Members had a reasonable expectation of privacy. Defendant did not inform Plaintiff that they were sharing her Sensitive Health Information with third parties, including Google.

73. By engaging in this improper sharing of information without Plaintiff's and Class Members' consent, Defendant breached Plaintiff's and Class Members' right to privacy and unlawfully disclosed their Sensitive Health Information.

74. Despite never telling users like Plaintiff and Class Members, Defendant allowed third parties such as Google to intercept Plaintiff's and Class Members' Sensitive Health Information and use it for advertising purposes.

**ii. The Tracking Tools Used by Defendant Were Imperceptible to Plaintiff and Class Members**

75. The Tracking Tools installed on the Website were invisible to Plaintiff and Class Members. Without analyzing the network information transmitted by the Website through examination of its source code or the use of sophisticated web developer tools, there was no way for a Website user to discover the presence of the Tracking Tools. As a result, typical internet users, such as Plaintiff and Class Members, were unable to detect the Tracking Tools on the Website.

76. Plaintiff and Class Members were shown no disclaimer or warning that their Sensitive Health Information would be disclosed to any unauthorized third party without their express consent.

77. Plaintiff and Class Members did not know that their Sensitive Health Information was being collected and transmitted to an unauthorized third party.

78. Because Plaintiff and Class Members were not aware of the Tracking Tools on the Website, or that their Sensitive Health Information would be collected and transmitted to Google, they could not and did not consent to Defendant's conduct.

**G. DEFENDANT WAS ENRICHED BY ITS DISCLOSURE OF PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE HEALTH INFORMATION TO THIRD PARTIES**

**i. Defendant Received Material Benefits in Exchange for Plaintiff's Sensitive Health Information**

79. As explained, *supra*, users of Google's Business Tools, like Defendant, receive access to advertising and marketing analytics services in exchange for installing Google's Tracking Tools on its website.

80. Upon information and belief, Defendant, as a user of Google's Business Tools, received compensation in the form of advanced advertising services and cost-

effective marketing on third-party platforms in exchange for allowing Google to collect Plaintiff's and Class Members' Sensitive Health Information.

### ii. Plaintiff's and Class Members' Data Had Financial Value

81. Moreover, Plaintiff's and Class Members' Sensitive Health Information has value and Defendant's disclosure and interception of that Sensitive Health Information harmed Plaintiff and the Class.

82. According to the annual reports of Facebook, another major online advertising proprietor, the value it derives from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[16]

83. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

84. Moreover, health information is particularly valuable. Healthcare data brokers charge up to $125 per clinical data record, with electronic healthcare databases selling for up to $500,000.[17] In fact, compared to other types of personal data, healthcare data records are by far the most valuable, fetching prices of up to

---

[16] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Mar. 7, 2025).

[17] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

$250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[18]

85. Several companies have products through which they pay consumers for a license to track certain information. Indeed, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies, in addition to Google, that pay for browsing history information.

86. The unauthorized disclosure of Plaintiff's and Class Members' private and Sensitive Health Information has diminished the value of that information, resulting in harm including Plaintiff and Class Members.

### H. DEFENDANT'S USE OF THE TRACKING TOOLS VIOLATES HIPAA.

87. The disclosure of Plaintiff's and Class Members' Private Information via the Pixels contravenes the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Private Information.[19]

88. The HIPAA Privacy Rule sets forth policies to protect all Individually Identifiable Health Information ("IIHI") and Personal Health Information ("PHI") that is held or transmitted by a covered entity such as Defendant.

89. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition

---

[18] Todd Zigrang & Jessica Bailey-Wheaton, *Valuing Healthcare Data*, THE VALUE EXAMINER (2023), *available online at*: https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf

[19] *The HIPAA Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html (last visited Mar. 7, 2025).

of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

90. The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

91. There are 18 HIPAA Identifiers that are considered personally identifiable information because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Google account) to identify a single individual. When IIHI is used in conjunction with one's physical or mental health or condition, health care, and/or one's payment for that health care, it becomes Personal Health Information ("PHI").

92. Additionally, information revealing that an individual is receiving medical service or treatment is PHI. In its 2012 Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the U.S. Department of Health and Human Services (HHS) instructed health care providers that, while identifying information alone is not necessarily PHI if it is part of a public source uncoupled from health data (e.g., a phone book), "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."

93. HHS has repeatedly instructed covered entities that patient status is protected by the HIPAA Privacy Rule:

a. "The sale of a patient list to a marketing firm" is not permitted

under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

b. "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002); and

c. It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013).

94. While healthcare entities regulated under HIPAA may use third-party tracking tools, such as the Tracking Tools, they can do so only in a very limited way, i.e., to perform analysis on data key to their operations.

95. When the information that a regulated entity collects through technologies or discloses to third parties (e.g., tracking technology vendors like Google) includes PHI, the protections under the HIPAA Privacy Rule apply.[20]

96. Put simply, HIPAA covered entities such as Defendant are not permitted to use tracking technology tools (like Pixels) in a way that exposes an individual's PHI to any third party without that individual's express and informed consent.

97. In a joint letter to approximately 130 hospital systems and telehealth provides, the Office for Civil Rights (OCR) at the HHS and Federal Trade Commission (FTC) acknowledged that tracking technology tools "gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users."[21] Disclosures to third parties by these tracking tools can "reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[22]

---

[20] *See Letter regarding Use of Online Tracking Technologies*, FEDERAL TRADE COMMISSION, available at: https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf (last visited Nov. 6, 2025).

[21] *Id.*

[22] *Id.*

98. The HHS and FTC warn that the "[i]mpermissible disclosures of an individual's [PHI] to third parties may result in a wide range of harms to an individual or others," including "identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others."[23]

99. Under Federal Law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[24]

100. Consistent with this restriction, the HHS has issued marketing guidance that provides:

> With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list.[25]

101. The HIPAA Privacy Rule further requires any "covered entity"—which includes Defendant—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

102. In contravention of HIPAA, Defendant failed to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health

---

[23] *Id.*

[24] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

[25] *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Nov. 7, 2025).

information[,]” 45 C.F.R. § 164.306(c), and to “[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights.” 45 C.F.R. § 164.312(a)(1).

103. Defendant failed to comply with other HIPAA safeguard regulations as follows:

a. Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

b. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. section 164.308(a)(1);

c. Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendant in violation of 45 C.F.R. § 164.308(a)(6)(ii);

d. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

e. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

f. Failing to effectively train its workforces (including independent contractors) on the policies and procedures for PHI as necessary and appropriate to carry out job functions while maintaining security of PHI beyond using imitation phishing email software in violation of 45 C.F.R. §§ 164.530(b) and 164.308(a)(5); and

g. Failing to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

104. Defendant violated the Privacy Rule by providing patient information to third parties without first obtaining express consent from Plaintiff and Class Members.

## I. PLAINTIFF'S AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY

105. At all times when Plaintiff and Class Members provided their Sensitive Health Information to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share their Sensitive Health Information with third parties for a commercial purpose unrelated to providing them with medical care.

106. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

107. For example, a recent Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.

108. Moreover, Americans are particularly interested in the safety of their health information. Over 50-percent of Americans believe that "medical-records privacy is not sufficiently protected today by law and organizational practices."

109. And, in a study performed by the National Institutes of Health, nearly 80-percent of respondents reported being "very concerned" or "concerned" about the privacy of medical records.

110. Personal data privacy and obtaining consent to share Sensitive Health Information are material to Plaintiff and Class Members.

### iii. Defendant's Use of HTTPS Reinforces Plaintiff's and Class Members' Reasonable Expectations of Privacy

111. As discussed above, *see* §IV.A.i, communications with the Website are encrypted, including the URLs.

112. Because Defendant's Website uses HTTPS, even a technically sophisticated user would reasonably expect privacy in their communications with the Website. Third parties viewing communications with Defendant could only learn that the users visited the Website, but third parties could only guess as to the purpose of the visit. Use of HTTPS helps ensure that users of the internet can reasonably expect a substantial degree of privacy in their browsing activity. Defendant's use of the Tracking Tools violates those reasonable expectations, particularly when it uses the Tracking Tools to conduct individually-identifiable tracking of telephone calls initiated by users and insurance evaluation requests submitted by users.

## V. <u>TOLLING AND ESTOPPEL</u>

113. Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of the incorporation of Google's Tracking Tools onto the Website.

114. The Tracking Tools on the Website were and are invisible to the average website visitor.

115. Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

116. Plaintiff was ignorant of the information essential to pursue the claims, without any fault or lack of diligence on her part.

117. Defendant had exclusive knowledge that the Website incorporated the Pixels and other Tracking Tools and yet failed to disclose to patients, including Plaintiff and Class Members, that by scheduling appointments through the Website, Plaintiff's and Class Members' Sensitive Health Information would be disclosed or released to unauthorized third parties, including Google.

118. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its patients' Sensitive Health Information. In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to its patients that they have disclosed or released their Sensitive Health Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

119. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

120. The earliest Plaintiff or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

## VI. CLASS ALLEGATIONS

121. This action is brought by the named Plaintiff on her behalf and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

122. The Nationwide Class that Plaintiff seeks to represent is defined as follows:

**The Nationwide Class**

All natural persons who used the Website to schedule or re-schedule an appointment, and whose Sensitive Health Information was disclosed or transmitted to Google or any other unauthorized third party.

123. In addition to the claims asserted on behalf of the Nationwide Class, Plaintiff asserts claims on behalf of separate California Subclass, which is defined as follows:

**California Subclass**

All natural persons residing in the State of California who used the Website to schedule or re-schedule an appointment, and whose

Sensitive Health Information was disclosed or transmitted to Google, or any other unauthorized third party.

124. The Nationwide Class and California Subclass are collectively referred to herein as the "Class." Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; Defendant and its parents or subsidiaries, any entities in which it has a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns; and any Judge conducting any proceeding in this action and members of their immediate families.

125. Plaintiff reserves the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

126. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. There are likely thousands of individuals who have been impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

127. **Commonality.** Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

a) Whether and to what extent Defendant had a duty to protect the Sensitive Health Information of Plaintiff and Class Members;

b) Whether Defendant had duties not to disclose the Sensitive Health Information of Plaintiff and Class Members to unauthorized third parties;

c) Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Sensitive Health Information would be disclosed to third parties;

d) Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Sensitive Health Information was being disclosed without their consent;

e) Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of patients' Sensitive Health Information;

f) Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Sensitive Health Information belonging to Plaintiff and Class Members free from unauthorized disclosure;

g) Whether Defendant violated the statutes asserted as claims in this Complaint;

h) Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

i) Whether Defendant knowingly omitted material representations with respect to its data security and/or privacy policy practices; and

j) Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Sensitive Health Information.

128. **<u>Typicality</u>.** Plaintiff's claims are typical of those of other Class Members because Plaintiff's Sensitive Health Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the Tracking Tools.

129. **<u>Adequacy</u>.** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

130. **<u>Predominance</u>**. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members in that all the Plaintiff's and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including Google, in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

131. **<u>Superiority</u>.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

132. Defendant acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

133. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Sensitive Health Information and not disclosing it to unauthorized third parties;

b) Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Health Information;

c) Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d) Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Sensitive Health Information would be disclosed to third parties;

e) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

f) Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

134. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the unauthorized disclosures that have taken place.

**COUNT I**
**COMMON LAW INVASION OF PRIVACY**
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the California Subclass)***

135. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 132 as if fully set forth herein.

136. Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their highly personal and statutorily protected Sensitive Health Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to the exfiltration and/or unauthorized sharing of their communications without Plaintiff's and Class Members' knowledge or

consent, and (3) preventing the distribution of their Sensitive Health Information through the advertising network of Google, the largest internet advertiser in the world.

137. Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via the Website and the communications platforms and services therein.

138. Plaintiff and Class Members communicated Sensitive Health Information that they intended for only Defendant to receive and that they understood Defendant would keep private and secure.

139. Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and informed consent of Plaintiff and Class Members is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion.

140. Moreover, Defendant's knowing disclosure of Plaintiff's Sensitive Health Information to Google, the largest advertiser in the world, to be used for advertising purposes, constitutes a publication of private facts.

141. Plaintiff and Class Members had a reasonable expectation of privacy given Defendant's Privacy Policies and other representations.

142. Moreover, Plaintiff and Class Members have a general expectation that their communications regarding sensitive, highly personal information would be protected from surreptitious disclosure to third parties.

143. Defendant's disclosure of Plaintiff's and Class Members' Sensitive Health Information coupled with individually identifying information is highly offensive to the reasonable person.

144. As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

145. Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to compensatory and/or nominal damages.

146. Plaintiff and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as a result of the intrusions upon their privacy.

147. Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

148. Plaintiff also seeks such other relief as the Court may deem just and proper.

**COUNT II**
**NEGLIGENCE**
***On Behalf of Plaintiff and the Nationwide Class or, alternatively, the California Subclass)***

149. Plaintiff repeats and realleges the allegations contained in in paragraphs 1 through 146 as if fully set forth herein.

150. Through their use of the Website, Plaintiff and Class Members provided Defendant with their Sensitive Health Information, believing such Information would be kept confidential.

151. By collecting and storing this data, Defendant had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

152. Defendant negligently failed to take reasonable steps to protect Plaintiff's and Class Members' Sensitive Health Information from being disclosed to third parties, without their consent, including to Google.

153. Defendant further negligently omitted to inform Plaintiff and the Class that they would use their Sensitive Health Information for marketing purposes, and/or that their Sensitive Health Information would be transmitted to third parties.

154. Defendant knew, or reasonably should have known, that Plaintiff and the Class would not have provided their Sensitive Health Information to Defendant had they known that Defendant intended to use that Information for unlawful purposes.

155. Defendant's conduct has caused Plaintiff and the Class to suffer damages by having their highly personal, personally identifiable Sensitive Health Information accessed, stored, and disseminated without their knowledge or consent.

156. Plaintiff and Class Members are entitled to compensatory, nominal, and/or punitive damages.

157. Defendant's negligent conduct is ongoing, in that it still holds the Sensitive Health Information of Plaintiff and Class Members in an unsafe and unsecure manner. Therefore, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

## COUNT III
## BREACH OF IMPLIED CONTRACT
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the California Subclass)***

158. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 155 as if fully set forth herein.

159. When Plaintiff and Class Members provided their Sensitive Health Information to Defendant in exchange for health-related services, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose the Sensitive Health Information without consent.

160. Plaintiff and Class Members accepted Defendant's offers and provided their Sensitive Health Information to Defendant.

161. Plaintiff and Class Members would not have entrusted Defendant with their Sensitive Health Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Sensitive Health Information without consent.

162. Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Sensitive Health Information to third parties like Google.

163. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein.

164. Plaintiff and Class Members would not have used Defendant's services, or would have paid substantially less for those services, had they known their Sensitive Health Information would be disclosed.

165. Plaintiff and Class Members are entitled to compensatory, consequential, and/or nominal damages as a result of Defendant's breaches of implied contract.

**COUNT IV**
**UNJUST ENRICHMENT**
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the California Subclass)***

166. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 163 as if fully set forth herein.

167. Plaintiff pleads this claim in the alternative to her breach of implied contract claim.

168. Plaintiff and Class Members conferred a monetary benefit on Defendant in exchange for healthcare related services. Specifically, they provided their Sensitive Health Information to Defendant which Defendant then utilized for marketing and advertising purposes, as described, *supra*.

169. Defendant knew that Plaintiff and Class Members conferred a benefit upon them, which Defendant accepted. Defendant profited from the Sensitive Health Information of Plaintiff and Class Members by exchanging it for marketing and advertising services.

170. In particular, Defendant enriched themselves by obtaining the inherent value of Plaintiff's and Class Members' Sensitive Health Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiff's and Class Members' Sensitive Health Information.

171. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the privacy of their patients' Sensitive Health Information.

172. Under the principles of equity and good conscience, Defendant should not be permitted to retain such benefits obtained by its surreptitious collection and transmission of Plaintiff's and Class Members' Sensitive Health Information.

173. If Plaintiff and Class Members knew that Defendant had not reasonably secured their Sensitive Health Information, they would not have agreed to provide their Sensitive Health Information to Defendant.

174. Plaintiff and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of money damages.

175. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer injury.

176. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them, or to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

## COUNT V
## VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA"), 18 U.S.C. § 2511(1), *et seq.*
**Unauthorized Interception, Use, and Disclosure**
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the California Subclass)***

177. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 174 as if fully set forth herein.

178. The ECPA protects both sending and receipt of communications.

179. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

180. The transmissions of Plaintiff's Sensitive Health Information to the Website qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

181. Electronic Communications. The transmission of Sensitive Health Information between Plaintiff and Class Members and the Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

182. Content. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

183. Interception. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

184. Electronical, Mechanical or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiff's and Class Members' browsers;

b. Plaintiff's and Class Members' computing devices;

c. Defendant's web-servers; and

d. The Pixel code deployed by Defendant to effectuate the sending and acquisition of patient communications.

185. By utilizing and embedding the Pixels on the Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

186. Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Pixels, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Private Information to third parties such as Google.

187. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff and Class Members regarding their Sensitive Health Information, including the medical clinic with which they were scheduling an appointment and the reason for their appointment.

188. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to third parties, while knowing or having reason to know that such information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

189. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

190. Unauthorized Purpose. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

191. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

192. However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Sensitive Health Information does not qualify for the party exemption.

193. Defendant's acquisition of sensitive communications that was used and disclosed to Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

a. Invasion of privacy;

b. Breach of implied contract;

c. Violations of HIPAA, 42 U.S.C. § 1320d-6(a)(3); and

d. Violations of the California Invasion of Privacy Act ("CIPA"), Cal. Pen. Code § 360, *et seq.*

194. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it used and caused to be used cookie identifiers associated with specific users, including Plaintiff and Class Members, without user authorization; and disclosed individually identifiable Sensitive Health Information to Google without user authorization.

195. Defendant are not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiff's and Class Members' communications about their Sensitive Health Information on the Website, because they used its participation in these communications to improperly share Plaintiff's and Class Members' Private Information with Google and other third-parties that did not participate in these communications, that Plaintiff and Class Members did not know were receiving their Sensitive Health Information, and that Plaintiff and Class Members did not consent to receive their Sensitive Health Information.

196. As such, Defendant cannot viably claim any exception to ECPA liability.

197. Plaintiff and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a. Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their Sensitive Health Information

for commercial purposes has caused Plaintiff and Class Members to suffer emotional distress;

b. Defendant received substantial financial benefits from its use of Plaintiff's and Class Members' Sensitive Health Information without providing any value or benefit to Plaintiff or Class Members;

c. Defendant received substantial, quantifiable value from its use of Plaintiff's and Class Members' Sensitive Health Information, such as understanding how people use the Website and determining what ads people see on the Website, without providing any value or benefit to Plaintiff or Class Members;

d. Defendant failed to provide Plaintiff and Class Members with the full value of the services for which they paid, which included a duty to maintain the confidentiality of their Sensitive Health Information; and

e. The diminution in value of Plaintiff's and Class Members' Sensitive Health Information and/or the loss of privacy due to Defendant making such Sensitive Health Information, which Plaintiff and Class Members intended to remain private, no longer private.

198. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Tracking Tools to track and utilize Plaintiff's and Class Members' Sensitive Health Information for financial gain.

199. Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

200. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading their privacy via the Pixels.

201. Any purported consent that Defendant may claim they received from Plaintiff and Class Members was not valid.

202. In sending and acquiring the content of Plaintiff's and Class Members' communications relating to their use of the Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

203. As a result of Defendant's violation of the ECPA, Plaintiff and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

**COUNT VI**
**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA")**
**Cal. Pen. Code § 360, *et seq.***
***(On Behalf of Plaintiff and the California Subclass)***

204. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 201 as if fully set forth herein.

205. The California Legislature enacted CIPA in response to "advances in science and technology" that "have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications[,]" recognizing that "the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Pen. Code. § 630.

206. Under CIPA, it is unlawful to:

a. "[W]illfully and ***without the consent of all parties to the communication***, or in any unauthorized manner, read[], or attempt[] to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or

passing over any wire, line, or cable, or is being sent from, or received at any place within this state;" or

b. "[U]se, or attempt[] to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained[;]" or

c. "[A]id, agree[] with, employ[], or conspire[] with any person or persons to unlawfully do, or permit, or cause to be done any of the acts [prohibited by CIPA.]"

Cal. Penal Code § 631(a) (emphasis added).

207. At all relevant times, Defendant aided, employed, agreed with, and conspired with Google, and likely other third parties, to track and intercept Plaintiff's and Class Members' internet communications while using the Website, specifically by installing and configuring the Tracking Tools to permit Google to eavesdrop on and intercept in real-time the content of intercept Plaintiff's and Class Members' private communications with Defendant.

208. The content of those conversations included Sensitive Health Information. Through Defendant's installation and configuration of the Tracking Tools on the Website, these communications were intercepted by Google during the communications and without the knowledge, authorization, or consent of Plaintiff and Class Members.

209. Defendant intentionally inserted electronic devices into the Platform that, without the knowledge and consent of Plaintiff and Class Members, transmitted the substance of their confidential communications with Defendant to third parties.

210. Defendant willingly facilitated Google's and other third parties' interception and collection of Plaintiff's and Class Members' Sensitive Health Information by embedding the Tracking Tools on the Website, thereby assisting Google's eavesdropping.

211. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Tracking Tools fall under the broad catch-all category of "any other manner":

a. The computer codes and programs Google and other third parties used to track intercept Plaintiff's and Class Members' communications while they were navigating the Website;
b. Plaintiff's and Class Members' internet browsers;
c. Plaintiff's and Class Members' computing and mobile devices;
d. Google's web and ad servers;
e. The web and ad servers from which Google and other third parties tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate the Website; and
f. The computer codes and programs used by Google and other third parties to effectuate their tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit the Website.

212. As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting third parties, including Google, and their agents, employees, and contractors, to receive Plaintiff's Class Members' Sensitive Health Information in real time, through the Website, without obtaining consent.

213. By disclosing Plaintiff's and Class Members' Sensitive Health Information, Defendant violated Plaintiff's and Class Members' statutorily protected right to privacy.

214. As a result of Defendant's violation of the CIPA, Plaintiff and Class Members are entitled to treble actual damages related to their loss of privacy in an amount to be determined at trial, statutory damages, attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff, on behalf of herself and other Class Members, prays for judgment against Defendant as follows:

A. an Order certifying the Nationwide Class and California Subclass, and appointing the Plaintiff and her Counsel to represent the Classes;

B. equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Sensitive Health Information of Plaintiff and Class Members;

C. injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members;

D. an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E. an award of attorney fees, costs, and litigation expenses, as allowed by law;

F. prejudgment interest on all amounts awarded and

G. all such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and other members of the proposed Classes, hereby demands a jury trial on all issues so triable.

Dated: May 26, 2026

Respectfully submitted,

/s/ Daniel Srourian
Daniel Srourian (SBN 285678)
**SROURIAN LAW FIRM, P.C.**
468 N. Camden Dr.
Suite 200
Beverly Hills, CA 90210
P: (213) 474-3800
E: daniel@slfla.com

Sonjay C. Singh*
**SIRI & GLIMSTAD LLP**
400 East Pratt Street
8th Floor - #16946751
Baltimore, MD 21202
E: ssingh@sirillp.com

M. Zane Johnson*
**SIRI & GLIMSTAD LLP**
100 Pearl Street
14th Floor - # 16946876
Hartford, CT 06103
E: zjohnson@sirillp.com

**pro hac vice admission anticipated*